RALPH A. SCHWARTZ, ESQ.
Nevada Bar No. 5488
**Ralph A. Schwartz, PC**
400 S. 7th Street, Suite 100
Las Vegas, NV 891091
Tel:    (702) 888-5291
Fax:    (702) 888-5292
ralphschwartz@yahoo.com

EDWIN B. BROWN ESQ., (Pro Hac Vice Pending)
California Bar No. 89447
BROWN CLARK LE AMES STEDMAN & CEVALLOS, LLP
225 Hospitality Lane, Suite 314
San Bernardino, CA 92408
Phone: (909) 890-5770
Email: mcpclark@clark-le.com

Attorneys for Plaintiff ROBERT COACHE

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| ROBERT COACHE, an Individual,<br><br>        Plaintiff,<br><br>vs.<br><br>LAS VEGAS METROPOLITAN POLICE DEPARTMENT, a government entity; CLARK COUNTY, a political subdivision of the State of Nevada and a government entity; MARC DIGIACOMO, an individual and an employee of a government entity; SARAH E. OVERLY, an individual and an | CASE NO.:<br><br>**COMPLAINT FOR:**<br><br>1. **VIOLATION OF THE FOURTEENTH AMENDMENT DUE PROCESS (42 U.S.C. § 1983);**<br>2. **VIOLATION OF THE FOURTH AMENDMENT (42 U.S.C. § 1983);**<br>3. **DETENTION WITHOUT PROBABLE CAUSE AND DEPRIVATION OF LIBERTY;**<br>4. **FAILURE TO INTERVENE (42 U.S.C. § 1983);**<br>5. **CONSPIRACY TO DEPRIVE CONSTITUTIONAL RIGHTS (42 U.S.C. § 1983);**<br>6. **VIOLATION OF POLICY (42 U.S.C. § 1983);** |

COMPLAINT

employee of a government entity; COLIN HAYNES, an individual and an employee of a government entity; NATHAN CHIO, an individual and an employee of a government entity; and DOES 1-30,

Defendants

7. **MALICIOUS PROSECUTION;**
8. **ABUSE OF PROCESS;**
9. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS;**
10. **CIVIL CONSPIRACY;**
11. **INDEMNIFICATION.**

Plaintiff Robert Coache ("Coache") brings now his complaint for damages against Defendants Las Vegas Metropolitan Police Department ("LVMPD"), Las Vegas Metropolitan Police Detective Colin Haynes ("Haynes"), Las Vegas Metropolitan Police Detective Nathan Chio ("Chio"), Clark County, Clark County Special Deputy District Attorney Marc DiGiacomo ("DiGiacomo"), Clark County Deputy District Attorney Sarah E. Overly ("Overly"),and DOES 1 through 30, (collectively "Defendants") as a result of Defendants' wrongful conviction of Coache for the crimes of bribery, extortion, conspiracy and money laundering, crimes Coache did not commit.

As a result of the misconduct of the Defendants, Coache has sustained significant damages, including loss of his liberty, loss of his income, loss of his property, loss of his professional license and professional reputation, severe emotional distress, and many other forms of damage as described hereafter.

## **INTRODUCTION**

1.      Coache spent over sixteen months in prison and was on parole for conspiracy to commit extortion by public officer or employee, extortion by public officer or employee, conspiracy to commit asking or receiving bribe by public officer, asking, or receiving bribe by public officer, conspiracy to commit money laundering, and forty-four

counts of money laundering before the Nevada Supreme Court issued a unanimous decision ordering all forty-nine of the wrongful convictions be reversed.

2.      Coache, who was 55 at the time of the alleged crimes, is completely innocent of the forty-nine crimes for which he was charged and found guilty by jury trial.

3.      Coache's wrongful conviction was no accident. It was the direct result of misconduct by Defendant LVMPD Detectives and Clark County Deputy District Attorneys

4.      Coache consistently and adamantly maintained his innocence of the alleged crimes.

5.      No evidence linked the innocent Coache to the alleged crimes in any way. In fact, on November 14, 2018, during oral arguments held before the Nevada Supreme Court, when questioned, Defendant DiGiacomo admitted that he **did not** have any evidence that Coache committed any of the crimes for which he was unlawfully convicted. The magnitude of such an admission by Defendant DiGiacomo, a high-ranking Special Deputy District Attorney, before the Nevada Supreme Court Justices, that he pursued charges, prosecution, and the incarceration of Coache knowing he had no evidence of guilt cannot be understated.

6.      The LVMPD Detectives' conduct was overseen by Defendant supervising officers who, upon information and belief, knew or should have known of the misconduct of the LVMPD Detectives, lack of training, fabrication of crimes, false statements, and a complete lack of evidence

7.      The Deputy District Attorney's conduct was overseen by Defendant supervising Attorneys who, upon information and belief, knew or should have known of the misconduct of the Special Deputy District Attorney's and Deputy District Attorney malicious altering of Court Documents, false statements, solicitation of false statements and complete lack of evidence

8.      Like a volcanic eruption, the rarity of Nevada Supreme Court Justices unanimously stating that no reasonable juror should have convicted Coache, puts any

interested party on notice that the instant prosecution was seriously flawed. For instance, in addition to Defendant DiGiacomo admitting he had no evidence of a crime, the State never charged the person, John Lonetti, who supposedly gave the bribe to Michael Johnson with any crime. Coache's wrongful conviction was ordered to be reversed by the Nevada Supreme Court on July 19, 2019. The convictions were subsequently vacated on December 2, 2020.

## JURISDICTION AND VENUE

9.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Coache's rights as secured by the United States Constitution.

10.      This Court has subject matter jurisdiction because the torts and wrongful acts of the Defendants took place in Clark County, Nevada.

11.      The Court has personal jurisdiction over the Defendants because they reside in Clark County, Nevada.

12.      Venue is properly laid in the Clark County District Court of Nevada, the District in which the claims arose.

13.      Plaintiff respectfully demands a trial by jury on all issues and claims set forth in this Complaint, pursuant to the Seventh Amendment of the United States Constitution and Fed. R. Civ. P. 38(b).

## THE PARTIES

14.      Plaintiff Coache is currently 62 years old and is a resident of Las Vegas, Nevada, where he lives with his wife. He was fifty-eight years old at the time of his wrongful conviction.

15.      Defendant Chio was, at all times relevant to this Complaint, employed as a law enforcement officer and employee of Defendant LVMPD. Defendant Chio acted under color of law and within the scope of his employment pursuant to the statutes,

ordinances, regulations, policies, customs, and usage of the LVMPD, Clark County, and the State of Nevada. Defendant Chio is sued in his individual capacity. Upon information and belief, Defendant Chio is entitled to indemnification under statute and by contract.

16.    Defendant Haynes was, at all times relevant to this Complaint, employed as a law enforcement officer and employee of Defendant LVMPD. Defendant Haynes acted under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the LVMPD, Clark County, and the State of Nevada. Defendant Haynes is sued in his individual capacity. Upon information and belief, Defendant Haynes is entitled to indemnification under statute and by contract.

17.    Defendant LVMPD is a political subdivision of the State of Nevada and employed the Defendants Chio and Haynes. The LVMPD is liable for all state law torts committed by the Defendants Chio and Haynes while they were employed by the LVMPD pursuant to the doctrine of respondeat superior. The LVMPD is responsible for its own policies, practices, and customs and the violation of Coache's constitutional rights that were caused by its policies,

18.    Defendant DiGiacomo was, at all times material, a special deputy district attorney for the District Attorney's Office for Clark County, Nevada ("Clark County District Attorney's Office"). DiGiacomo acted under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the Clark County, and the State of Nevada. DiGiacomo is sued in his individual capacity. Upon information and belief, DiGiacomo is entitled to indemnification by the Clark County District Attorney's Office under statute and by contract.

19.    Defendant Overly was, at all times material, a deputy district attorney for the Clark County District Attorney's Office. Overly acted under color of law and within the scope of her employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Clark County, and the State of Nevada. Overly is sued in her individual capacity. Upon information and belief, Overly is entitled to indemnification by the Clark County District Attorney's Office under statute and by contract.

20.     Defendant Clark County is a political subdivision of the State of Nevada which is formed and operated pursuant to the Nevada Revised Statutes. At all times relevant to the complaint, the Clark County District Attorney's Office was a subdivision of Clark County (collectively "Clark County") and employed the Defendants DiGiacomo and Overly. Clark County is liable for all state law torts committed by the Defendants DiGiacomo and Overly while they were employed by Clark County pursuant to the doctrine of respondent superior. Clark County is responsible for its own policies, practices, and customs and the violation of Coache's constitutional rights that were caused by its policies,

21.     Defendants DOES 1-10 were employed by LVMPD and were acting within the course and scope of their employment with the LVMPD, and with authority as such agents and employees, and with the consent and ratification of their Co-defendants and the LVMPD.

22.     DOES 11-20 were employed by Clark County and were acting within the course and scope of their employment with the Clark County DA, and with authority as such agents and employees, and with the consent and ratification of their Co-defendants and Clark County.

23.     The true names and capacities of Defendants DOES 1 through 30, inclusive, are unknown to Coache, who therefore sues said Defendants by such fictitious names.  Each of the Defendants designated herein as a DOE is negligently or otherwise legally responsible in some manner for the events and happenings herein referred to, and caused injuries and damages proximately thereby to Coache, as herein alleged.  Coache will ask leave of Court to amend this Complaint to show their names and capacities when they have been ascertained.

24.     At all times herein mentioned, Defendants were the agents, servants, and employees of each other, and at all times pertinent hereto were acting within the course and scope of their authority as agents, servants and/or employees, and acting on the implied and actual permission and consent.

//

### FACTS RELEVANT TO ALL CLAIMS FOR RELIEF

### Coache And Johnson Bought Acreage Called the "Madras Property"

25.     Coache is the former deputy state engineer and chief engineer for the Southern Nevada branch office of the Nevada State Engineer ("State Engineer") located in Las Vegas, Nevada. Coache worked for the State Engineer's office from 1981 until 2010.

26.     The State Engineer is appointed by the Director of the Nevada Department of Conservation and Natural Resources. The State Engineer has the sole statutory authority to issue permits for water users to divert water from all sources in the State, except the Colorado River.  For example, if a user wants to divert water from the Virgin River for use in Nevada, that user must obtain a permit from the State Engineer to do so.

27.     While employed by the State Engineer's office as the Chief Engineer and Deputy State Engineer, Coache did not have the Statutory authority to issue permits.

28.     Michael Johnson ("Johnson") was at all times material employed by the Virgin Valley Water District ("VVWD"). Johnson also performed consulting work to drill wells and secure groundwater rights for individuals in Southern Nevada.

29.     Coache and Johnson were friends. In 2004, Johnson and Coache bought 40 acres of land high above the Virgin River on "Mormon Mesa" near Moapa, Nevada, for $70,000 (the "Madras Property"). Coache owned 60% of the Madras Property and Johnson owned 40% of the property.

30.     John Lonetti ("Lonetti") owned an application for water rights and permitted water rights for diversion from the Virgin River appurtenant to land along the Virgin River near Mesquite, Nevada. Johnson met Lonetti in the 1990s and for many years consulted with Lonetti, helping him understand his water rights and how to develop them.

31.     Lonetti has never been accused of anything improper. Lonetti did not testify at trial. There is nothing in the record to support the proposition that Lonetti was in any way a "victim."

32.     Coache was not involved in any transaction with Lonetti. Johnson did not seek Coache's assistance in working on behalf of Lonetti, and Coache was not involved in the water and consulting transactions relevant to this case.

## The State Granted Lonetti a Permit for Virgin River Water

33.     As discussed above, the appointed State Engineer has the sole authority to issue water permits in the State of Nevada.  The first step in obtaining a water right is to identify a point of diversion from a water source. Next, an application to appropriate public waters must be made to the State Engineer to divert water from the source. The application must identify the point of diversion, the quantity of water requested, and the beneficial use. When the State Engineer considers an application, the State Engineer must consider: whether there is existing water at the source; whether existing water can be appropriated, considering other existing appropriations; whether approval would conflict with existing rights; and, whether the issuance of the permit would impair the rights of a domestic well user. These criteria are codified at NRS 533.370.

34.     The ultimate decision to approve or deny an application is made by the State Engineer, who often makes that decision after a "Ready for Action" committee makes a recommendation.  If the application is granted, and the fee paid, the applicant owns a permit to divert water.  To perfect the water right, the permit owner must divert the water and apply it to a beneficial use for one year, which must be accomplished within five years.  When proof of same is filed with the State Engineer, the water right becomes certified.

35.     However, even prior to certification, a permit has value and can be bought and sold at any stage of the process. Nevada is a "Prior Appropriation" State, which means that every water right has a priority date, determined by the date the application for appropriation is filed with the State Engineer.  In theory, "senior" water rights (water

COMPLAINT

8

rights that were applied for at an earlier date) must be satisfied prior to "junior" water rights (which were requested later in time), which makes senior water rights more valuable than junior water rights in case of curtailment due to inadequate supply.  In practice, absent an ordered curtailment, the priority date has no effect on the actual use of the water rights.

36.     From 1989 through 1994, SNWA filed multiple applications with the State Engineer to appropriate Virgin River water.  These efforts were part of SNWA's attempts to obtain water from rural Nevada in order to satisfy the increasing demands of Clark County. SNWA also filed applications to obtained water from Nye, Lincoln, and White Pine counties.

37.     In 1994, the State Engineer issued Ruling 4151, which SNWA interpreted as allocating all remaining unappropriated water from the Virgin River, approximately 190,000 acre-feet annually (approximately 6.2 billion gallons of water), to SNWA.

38.     Ruling 4151 ignored the fact that Lonetti had previously (1990) filed Application 54383, awaiting action from the State Engineer. Lonetti's 1990 application was senior to SNWA's 1993 application approved as part of ruling 4151.

39.     As discussed above, Lonetti filed an application for water rights in 1990. The State Engineer, Jason King, testified that Lonetti's application fell through the cracks at the State Engineer's office.  Even when the State Engineer issued Ruling 4151 in 1994, the State Engineer did not act upon Lonetti's senior (1990) application.

40.     On January 4, 2006, 16 years after Lonetti's application, the State Engineer sent Lonetti a letter asking whether he remained interested in pursuing his 1990 permit application (#54383). Lonetti was given 30 days to respond to the State Engineer.

41.     Not surprisingly, Lonetti consulted with Johnson regarding the matter. Lonetti wanted Johnson to help him turn his 1990 application into an extremely valuable permit (Johnson was familiar with NRS Chapter 533 and discovered that applications junior to Lonetti's 1990 application had been granted by the State Engineer). With Johnson's help, Lonetti replied that he needed more time to respond because of the complexities inherent in the water issues regarding the Virgin River.

42.     Subsequently, with Johnson's help, Lonetti informed the State Engineer that he did intend to pursue the 1990 application.

43.     The State Engineer granted Lonetti's permit on June 29, 2007. Coache, who worked in the State Engineer's Las Vegas office, had nothing to do with the granting of Lonetti's permit, and in fact was unaware at the time of Lonetti's application being granted by the State Engineer. No one at the State Engineer's office discussed Lonetti's application with Coache.

## Lonetti Contracted to Pay Johnson a Consulting Fee for Hydrologic, Title, Development and Marketing Services

44.     On February 1, 2007, Johnson and Lonetti had executed an agreement for consulting services.  In exchange for Johnson (through Rio Virgin, LLC) providing Lonetti with hydrologic, title, development and marketing services, Johnson (through Rio Virgin, LLC) received 10% ownership of Permit 3085 and 25% ownership of Application 54383 appurtenant to any water rights obtained appurtenant to application 54383 through Johnson's efforts.

45.     Coache was not involved in any transaction with Lonetti. Johnson did not seek Coache's assistance in working on behalf of Lonetti. In fact, Coache had never spoken to or meet Lonetti until sometime in 2012.

## Lonetti, SNWA and VVWD Enter into a Three-way Trade of Water Rights

46.     In December 2007 six months after the granting of Lonetti's permit 54383, the seven states sharing the Colorado River entered into an agreement with the federal government regarding the Colorado River and its tributaries. A provision of the "Seven States Agreement" was the creation of a class of water referred to as Intentionally Created Surplus, which allowed SNWA to purchase water from the Virgin River and Muddy River, allow that water to enter Lake Mead, and then allow SNWA to divert that water for its use. SNWA had not been allowed to do this prior to the Seven States Agreement.

47.     This agreement represented a seismic shift in the Law of the Colorado River, but the relevant provision only applied to pre-1929 water rights (1929 is the date of the Boulder Canyon Project Act). The Agreement enhanced the value of pre-1929 water rights, but only for SNWA's particular use.

48.     After December 2007, SNWA began actively pursuing the purchase of pre-1929 water rights from the Virgin River and Muddy River. The importance of the Seven States Agreement cannot be overstated with the provision that in the State of Nevada it only applied to SNWA's use of the water.

49.     With the issuance of Permit 54383, Lonetti owned two permits, 54383 and 3085. Permit 3085 was old surface water, approximately 601 acre-feet annually of pre 1929 water, with a priority date of 1914. Permit 54383 was newer surface water, 1,200 acre-feet annually, with a priority date of 1990.  Permit 3085 was much more valuable than 54383 because the pre-1929 water was more valuable to SNWA due to the 2007 Seven States Agreement.

50.     In January 2008, SNWA learned that Lonetti wanted to sell his Permits. SNWA was interested in purchasing 3085 (valued at $5.1M), but not 54383.  Johnson suggested to SNWA's John Entsminger that SNWA purchase both permits from Lonetti and then trade Permit 54383 to VVWD for Virgin River water shares which VVWD owned in the Bunkerville Irrigation Company (89 shares, 890 acre-feet annually of pre-1929 water).  Entsminger believed this transaction was beneficial for SNWA because SNWA would obtain 601 acre-feet annually of pre-1929 water from Lonetti's Permit 3085, plus 890 acre-feet annually of pre-1929 water from VVWD.  Entsminger also believed that the transaction was beneficial to VVWD because VVWD would trade 890 acre-feet annually of pre-1929 water for 1,200 acre-feet annually of water from Lonetti's Permit 54383.  VVWD did not care whether its water was pre-1929 water as it was not a party to the Seven States Agreement. Put simply, VVWD would gain water without having to pay for that additional water.

51.     Thus, VVWD got more surface water than it gave up. In addition to receiving more Virgin River surface water VVWD also received the remaining one-half

interest in applications for up to 65,000 acre-feet annually of ground water located within the Virgin River Valley Hydrographic Basin and 5,000 acre-feet annually of additional Virgin River surface water with senior priority over all of SNWA's Virgin River surface water rights. The transaction was a win-win for all parties involved.

52.     The trade was a good transaction for both water districts. SNWA received 890 acre-feet annually of pre 1929 surface water that could be wheeled to Lake Mead via the Virgin River and withdrawn from Lake Mead for use in the Las Vegas Metropolitan area and VVWD received ownership of 1,200 acre-feet annually of Virgin River surface water rights.

53.     Lonetti agreed to the transaction. SNWA agreed to the transaction. VVWD agreed to the transaction and the VVWD Board unanimously approved the transaction. On May 20, 2008, SNWA paid Lonetti $8.4M for Permits 3085 and 54383.  Then, SNWA exchanged Permit 54383 to VVWD for 89 shares of the Bunkerville Irrigation Company, as described above.  Lonetti paid Rio Virgin, LLC solely owned by Johnson $1.3M pursuant to the consulting agreement, Coache was not involved with this sale and exchange of water rights.

**Pursuant to Their Agreement, Lonetti Paid Johnson the Consulting Fee for Getting and Then Selling Water Rights**

54     At the request of Johnson, Steve Templeton ("Templeton") agreed to assist Johnson in setting up a Limited Liability Company for a potential commercial real estate development business and with the design and construction of potential projects. To that end, Templeton set up a limited liability company on Johnson's behalf called "Rio Virgin LLC". Coache was not involved in setting up the LLC or in any agreements Johnson and Templeton may have had.

55     Pursuant to their agreement, Lonetti paid Johnson $1.3 million based on his partial ownership of Permits 3085 and 54383 previously obtained per the consulting agreement. Johnson asked Lonetti to wire the $1.3 million commission into the Rio Virgin LLC bank account. The deposit was made on May 21, 2008.

//

**Coache Sold His Membership Interest of the Madras Property to Johnson**

56      As discussed above, Johnson and Coache had been friends for years. In 2004, they purchased an investment property together, a 40-acre parcel, and held title to the property in the name of Madras, LLC.  Coache owned 60% of Madras and Johnson owned 40% of Madras.  The Madras Property was appraised in May 2008 at $1,040,000. Coache agreed to sell his 60% share of the property to Johnson for $600,000. When Johnson received his $1.3 M consulting fee from Lonetti, Johnson traded 50% of Rio Virgin, LLC to Coache for Coache's 60% interest in Madras, LLC. This was how Coache became involved in this case because he owned 60% in Madras, LLC and traded the 60% in Madras, LLC for 50% of Rio Virgin, LLC, the entity which received the $1.3M consulting fee from Lonetti.

57      Between 2008 and 2010, Coache used his $600,000 in the Rio Virgin bank account to make joint purchases of real estate with Johnson, invest in stocks with Johnson through Charles Schwab and loaned some of the money to his son to buy a home.

58      Coache declared the $600,000 on his personal income tax return. Coache's certified public accountant advised Coache he had prepared thousands of returns and that Coache's returns were typical.

59      In 2010, with the exception of a rental home, Johnson and Coache decided to divest their joint investments from Rio Virgin, LLC. Sometime after the divestment of their joint investments, Templeton filed for the dissolution of the Rio Virgin LLC.

60      According to the State's logic, Coache must have been Johnson's co-conspirator in making Lonetti's Permit 54383 happen. This was all innuendo. The issuance of Permit 54383 was not only above board, but was mandated by statute, and Coache had absolutely no involvement in the issuance of Permit 54383.

61      Because the State assumed a conspiracy, where none occurred, and assumed bribery, extortion, and misconduct, none of which were supported by the facts

or the evidence, the State further assumed that every financial transaction by Johnson and Coache in any way relating back to the $1.3M constituted money laundering.

**The District Attorney Charged Coache with Crimes**

62      On May 25, 2011, the Clark County District Attorney filed a complaint against Coache, charging him with conspiracy to commit extortion by a public officer or employee (NRS 199.480); extortion by a public officer or employee (NRA 197.170); conspiracy to ask for or receive a bribe (NRS 197.040; NRS 199.480); misconduct of a public officer (NRS 197.110); conspiracy to commit money laundering (NRS 199.480; NRS 207.195); and money laundering (NRS 207.195).

**Defendants DiGiacomo and DOES 11-20 Knew There Were Insufficient Facts to Charge Coache with Extortion or Bribery**

63      NRS 197.170 states that "a public officer or employee who (1) asks, receives or agrees to receive a fee or other compensation for official service or employment either: (a) in excess of the fee or compensation allowed by statute therefor; or (b) Where a fee or compensation is not allowed by statute therefor; or (2) Requests money, property or anything of value which is not authorized by law, from any person regulated by the public officer or employee, and in a manner which would cause a reasonable person to be intimidated into complying with the request to avoid the risk of adverse action by the public officer or employee, commits extortion."

64      NRS 197.040 states: "A person who executes any of the functions of a public office not specified in NRS 197.030, 199.020 or 218A.965, and a person employed by or acting for the State or for any public officer in the business of the State, who asks or receives, directly or indirectly, any compensation, gratuity or reward, or any promise thereof, upon an agreement or understanding that his or her vote, opinion, judgment, action, decision or other official proceeding will be influenced thereby, or that he or she will do or omit any act or proceeding or in any way neglect or violate any official duty, is guilty of a category C felony."

65     Defendant DiGiacomo knew before charging Coache with violation of NRS 197.170 and NRS 197.040, that Coache did not request or receive any money for performing his duties as a deputy state engineer other than his normal salary. Defendant DiGiacomo knew before charging Coache with violation of NRS 197.170, that Coache did not grant, or influence the granting, of Lonetti's application for water rights.

66     Defendant DiGiacomo knew before charging Coache with violation of NRS 197.170 and NRS 197.040, that Coache did not perform any act to award water rights to Lonetti or trade those rights with VVWD or SNWA.

67     Defendant DiGiacomo knew before charging Coache with violation of NRS 197.170 and NRS 197.040, that Lonetti entered into a contract with Johnson whereby Johnson agreed to perform hydrologic, title, development, and marketing services for Lonetti's relative to Lonetti's permit and application for water rights on file with the State Engineer and to help Lonetti maximize those water rights in exchange for a small ownership of those rights.

68     Defendant DiGiacomo knew before charging Coache with violation of NRS 197.170 and NRS 197.040, that Johnson did not seek Coache's assistance at any stage helping Lonetti.  Defendant DiGiacomo knew that the State Engineer and his employees did not ask Coache for any help in deciding whether to grant Lonetti's application.

69     Defendant DiGiacomo knew before charging Coache with violation of NRS 197.170 and NRS 197.040, that Coache never communicated with Johnson, Lonetti or the state engineer's office employees regarding Lonetti's application.

70     Defendant DiGiacomo knew before charging Coache with violation of NRS 197.170 and NRS 197.040, that Coache simply had nothing to do with the granting of the Lonetti permit. Instead, a basin engineer with the State evaluated Lonetti's application. Then, senior managers in the state engineer's Carson City office evaluated the application.

71     Of course, Defendant DiGiacomo knew, as he admitted to the Nevada Supreme Court, that he had **no evidence** that Coache committed the crimes of extortion or bribery.

//

**<u>Defendants DiGiacomo and DOES 11-20 Knew There Were Insufficient Facts to</u>**
**<u>Charge Coache with Conspiracy</u>**

72     NRS 199.480(3) states in pertinent part: "Whenever two or more persons
conspire:

(a) To commit any crime other than those set forth in subsections 1 and 2, and no
punishment is otherwise prescribed by law;

(b) Falsely and maliciously to procure another to be arrested or proceeded
against for a crime;

(c) Falsely to institute or maintain any action or proceeding;

(d) To cheat or defraud another out of any property by unlawful or
fraudulent means;

(e) To prevent another from exercising any lawful trade or calling, or from
doing any other lawful act, by force, threats, or intimidation, or by
interfering or threatening to interfere with any tools, implements or
property belonging to or used by another, or with the use or employment
thereof;

(f) To commit any act injurious to the public health, public morals, trade, or
commerce, or for the perversion or corruption of public justice or the due
administration of the law; or

(g) To accomplish any criminal or unlawful purpose, or to accomplish a
purpose, not in itself criminal or unlawful, by criminal or unlawful means,
each person is guilty of a gross misdemeanor."

73     Defendant DiGiacomo knew before charging Coache that Coache did not
enter into **any** agreement for **any** unlawful purpose. Defendant DiGiacomo knew Coache
had no communications, let alone agreements, with Johnson or Lonetti regarding
Lonetti's application for water rights.

74      Defendant DiGiacomo knew before charging Coache that Coache had no communications, let alone agreements, with anyone at the state engineer's office regarding Lonetti's water rights. Defendant DiGiacomo knew Coache had no communications with Johnson or employees of VVWD or SNWA regarding the three-way trade of water rights.

75      Of course, Defendant DiGiacomo knew, as he admitted to the Nevada Supreme Court, that he had **no evidence** that Coache committed the crime of conspiracy.

**Defendants DiGiacomo and DOES 11-20 Knew There Were Insufficient Facts to Charge Coache with Money Laundering**

76      NRS 207.195 states that "if a monetary instrument represents the proceeds of or is directly or indirectly derived from any unlawful activity, it is unlawful for a person, having knowledge of that fact: (a) to conduct or attempt to conduct a financial transaction involving the instrument: (1) with the intent to further any unlawful activity; (2) with the knowledge that the transaction conceals the location, source, ownership or control of the instrument; or (3) with the knowledge that the transaction evades any provision of federal or state law that requires the reporting of a financial transaction."

77      Defendant DiGiacomo knew before charging Coache with violation of NRS 207.195 that Coache had committed no unlawful actions. The statute itself states that to be convicted of money laundering, the State must prove that the money that was "laundered" came from **unlawful activity**.

**DiGiacomo Opposed Coache's Motion to Dismiss the Charges Against Him**

78      Defendant DiGiacomo himself admitted he knew he had no evidence that Coache committed any of the crimes with which he charged Coache and therefore should never have brought charges against Coache. On August 30, 2011, Coache filed a motion to dismiss the charges against him for lack of evidence. The motion argued that Coache committed no crimes because he never had anything to do with the granting of Lonetti's water permits.

COMPLAINT

17

79     The Court should have granted the motion, but Defendant DiGiacomo vigorously opposed the motion, claiming he would produce evidence to support the charges. The Court therefore denied Coache's motion. Of course, as Defendant DiGiacomo admitted to the Nevada Supreme Court, he had no such evidence.

80     Defendant DiGiacomo went as far as tell the jury that Coache was the one responsible in Southern Nevada for giving out the right to water. Again, DiGiacomo knew that this statement was not true. He knew King would testify that the only person with any authority to issue a permit is the State Engineer.

81     In his opening statement, Defendant DiGiacomo stated, "A record from a file from, oh so long ago, that's missing half of its contents suggests that [Coache] did something to permit [the granting of Lonetti's application].

82     Again, the prosecutor had learned from his own witnesses before trial that he had not a shred of evidence that Mr. Coache had anything to do with the granting Lonetti's application.

83     Defendant DiGiacomo knew that Coache was never the State Engineer, did not sign the Lonetti water permit involved in this case, nor have anything to do with granting the permit.

**The Evidence at Trial Overwhelmingly Proved Coache Innocent of All Charges**

*The Government Did Not Present Evidence of a Bribe or Extortion*

84     Defendant DiGiacomo told the jury that Coache used his influence as a deputy state engineer to get the Lonetti permit granted. Defendant DiGiacomo knew by his own admission to the Nevada Supreme Court that was a lie.

85     The Government presented no evidence that Coache did anything to assist the granting of Lonetti's permit or assist in the three-way trade among Mr. Lonetti, VVWD and SNWA.  All of the evidence presented at trial showed that Coache did not even know about the Lonetti permit.

86     Two state engineers testified at trial. State Engineer, Tracy Taylor, testified at trial that he **did not** rely on Coache for any information, advice, or input regarding the Lonetti water right application.

87     State engineer Jason King also testified that he did not talk to Coache about the Lonetti application. No one testified that Coache had anything to do with the granting of the Lonetti permit.

88     Defendant DiGiacomo told the jury that Coache received a "bribe" of $600,000. By his own admission to the Nevada Supreme Court Defendant DiGiacomo knew that was also a lie. Indeed, the Government **never presented any evidence** at trial that Coache received a bribe, committed extortion, or entered into any conspiracy to commit extortion or receive a bribe.

89     To be exact, the Government never presented any evidence that VVWD, SNWA or Lonetti paid **any** money to Coache even though both agencies gained value from the water rights trade.

90     The only money the Government presented to the jury that Coache received was from Johnson to buy out his membership interest in the mutually owned Madras Property.

91     Because there was no bribe, the Government of course could not prove there was one.

### *The Government Did Not Present Evidence of Money Laundering*

92     Because Coache did not receive money from any unlawful activity, Coache was not guilty of money laundering. The Defendants presented no evidence Coache ever obtained any money from any **illegal** source or activity and Defendant DiGiacomo admitted to the Nevada Supreme Court that he had no evidence to present.  Instead, the undisputed evidence at trial was that the only money Coache received was the fair market value of his 60% ownership of the Madras property from Johnson.

### *The Government Did Not Present Evidence of a Conspiracy*

COMPLAINT

93      At trial, the Government presented no evidence that Coache entered into **any** agreement for **any** unlawful purpose. Defendants presented no evidence that Coache had any communications, let alone agreements, with Johnson or Lonetti regarding Lonetti's application for water rights and Defendant DiGiacomo admitted to the Nevada Supreme Court that he had no evidence to present.

94      At trial, the Defendants presented no evidence that Coache had any communications, let alone agreements, with anyone at the State Engineer's office regarding Lonetti's water rights. Defendants presented no evidence at trial that Coache had any communications with Johnson or employees of VVWD or SNWA regarding the three-way trade of water rights and Defendant DiGiacomo admitted to the Nevada Supreme Court that he had no evidence to present.

95      The Defendants failed to prove that Coache's sale of his share of the Madras Property was a "conspiracy" to commit "an illegal act." To the contrary, it was conclusively proven at trial that the agreements between Johnson and Coache regarding the Madras Property were entirely legal.

96      Because the State failed to prove that Coache entered into **any** agreement with anyone to perform an **illegal** act, the State failed to prove any conspiracy by Coache.

**Defendants DiGiacomo and Haynes Conspired to Present False Evidence**

97      Defendant DiGiacomo called Defendant Haynes as a trial witness. Defendant Haynes is a detective with Defendant LVMPD and claimed to be a certified money laundering specialist.

98      Defendant DiGiacomo had Haynes testify that Coache's financial activity was consistent with money laundering. Yet Defendants DiGiacomo and Haynes knew that to constitute money laundering, the accused's money must have derived from illegal activity. Defendant DiGiacomo knew that Defendant Haynes had absolutely no idea whether Coache ever received money from any illegal activity.

99      Despite having Defendant Haynes testify to money laundering, Defendant DiGiacomo knew that Johnson and Coache bought the Madras Property in 2004, then

COMPLAINT

Johnson decided to buy out Coache's 60% share of the Madras Property. Since the Madras Property was worth about $1 million, Johnson paid Coache $600,000 for his 60% ownership of the property.

100    Defendants DiGiacomo and Haynes therefore knew very well that the $600,000 Coache received from Johnson was from Coache's sale of his interest in the Madras property and not from any illegal activity, which Defendant DiGiacomo acknowledged before the Nevada Supreme Court when he stated he had no evidence Coache committed any of the crimes of which he was unlawfully convicted. Nevertheless, Defendant DiGiacomo had Defendant Haynes, the Government's money laundering expert, tell the jury that Coache laundered $600,000.

101    Defendants DiGiacomo and Haynes therefore knew very well that Coache received the money from a legal sale of real property.

**Defendants DiGiacomo and Chio Conspired to Present False Evidence**

102    Defendant DiGiacomo had LVMPD Sergeant Nathan Chio falsely testify that Coache had the authority to title water permits and if he was a party to the Lonetti agreement, he had committed a criminal offense. The truth, of course, well established by numerous witnesses, was that Coache had **no authority** to "title water permits" and was **not** a party to the Lonetti/Johnson agreement. It should be noted that Defendant DiGiacomo and Chio's investigative work was so inept they did not know that there is no such terminology as "title water permits" With regards to the water rights process.

103    Defendant DiGiacomo also had Defendant Chio read from Defendant's Exhibit O, an email prepared by an employee of the police department containing a hearsay statement about the case to support the preparation of subpoenas. The exhibit stated that "in 2005, Robert Coache (now retired state engineer) reviewed and approved a water rights purchase by Virgin Valley Water Authority in which the water authority and its members paid over $750,000.00 too much to a private seller for water rights."

104    Not only was the statement hearsay, but Defendant DeGiacomo also said in the presence of the jury that the information in Exhibit O was a summary of the facts

from Johnson himself. Defendant Chio also testified that some of the words in Exhibit O were from the mouth of Johnson.

105    Defendants DiGiacomo and Chio both knew that the truth was that the information in the exhibit was not from Johnson. Yet they give the false statement to the jury that Coache approved a water purchase by VVWD.  But Defendants DiGiacomo and Chio knew that the State Engineer did not regulate the sale of water.

106    Defendants DiGiacomo and Chio also both knew that only the boards of directors of SNWA and VVWD approved the three-way trade of water rights involving Lonetti, SNWA and VVWD. They knew that the State Engineer was not a party to the three-way trade and Coache was also not involved in the three-way trade or the granting of Lonetti's permit.

107    Defendants DiGiacomo and Chio told the jury that the VVWD was harmed in the sum of $750,000. But both defendants knew that the three-way water rights trade was beneficial to both SNWA and VVWD. The trade was good for VVWD because it received complete ownership of water rights to 1,200-acre-feet annually of surface water. Thus, VVWD got more surface water than it gave up. VVWD also received the remaining one-half interest in applications for up to 65,000 acre-feet of ground water in the basin and 5,000 acre-feet annually of additional surface water with a priority over all other surface water from the 1994 ruling.

108    VVWD got a lot more water and more flexibility on how to use it. Simply put, VVWD got a good deal with this transaction; so good in fact was the deal that no one from VVWD testified at trial to allege otherwise. No one testified from VVWD regarding the trade or the fabricated loss of $750,000. Not only did VVWD get more water but the water they got was senior to SNWA's water. Defendants DiGiacomo and Chio therefore both knew, when they told the jury that VVWD lost $750,000, that the VVWD received great value from the waters rights trade and was not damaged in the sum of $750,000, or in any sum.

**Defendants DiGiacomo and DOES 11-20 Intentionally Violated NRS 48.045 by Introducing Character Evidence Regarding Coache**

109    Defendant DiGiacomo knew that evidence of a person's character or a trait of his or her character is not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion.

110    Defendant DiGiacomo nevertheless presented evidence at trial that over 25 years ago, Coache's employer, the State Engineer, asked Coache to get approval before performing outside consulting work. Defendant DiGiacomo then introduced evidence that Vidler Water accused Coache of inappropriately permitting their water rights.

111    These allegations of long-ago alleged bad acts were prejudicial. The jury was left with the impression that Coache was not a stellar employee of the State Engineer's office, which he most certainly was. Moreover, Defendant DiGiacomo knew that Coache did not have the statutory authority to permit water rights and that these alleged acts had nothing to do with the charges in this trial.

**Defendant DiGiacomo did not Seek Dismissal of Charges When Trial Testimony Proved Coache Innocent**

112    Defendant DiGiacomo was of course present throughout Coache's entire trial. Not only was DiGiacomo fully aware that he did not have the facts to prosecute Coache of the crimes for which he charged Coache, he could see that he was unable to present any evidence to support the charges, which he later admitted before the Nevada Supreme Court.

113    Once the Government rested and it was apparent to Defendant DiGiacomo that he had not presented sufficient facts to convict Coache, he had the duty to ask the court to dismiss the charges against Coache. But he did not do so. In failing to ask for dismissal of the case, DiGiacomo violated Coache's constitutional rights.

**Defendants DiGiacomo and Overly Made Statements to the Jury in Closing Argument They Knew to be False**

COMPLAINT

114    It is well settled that prosecutors have a duty to avoid engaging in conduct which might deprive defendant of a fair trial and should be unprejudiced, impartial, and nonpartisan.

115    A prosecutor may not pursue a conviction outside the bounds of acceptable advocacy. Defendants DiGiacomo and Overly violated Coache's constitutional rights when they insinuated to the jury the existence of evidence that was clearly not in the record.

116    Defendant DiGiacomo's closing argument was full of misconduct. Ignoring the evidence that was presented at trial, DiGiacomo fabricated a story about Coache that was not only untrue but bore no semblance to the actual evidence.

117    Defendant DiGiacomo even misstated the law to the jury. He said that "This is actually a simple case. This is a case about the taking of money … for having done nothing … then hiding that money and using it for personal gain." Defendant DiGiacomo knew he had presented no evidence that Coache "took" any money from anyone then "hid" that money.

118    Defendant DiGiacomo had his associate, Defendant Overly, tell the jury that the State "didn't need to prove that Bob Coache's comments or actions actually titled Mr. Lonetti's [permit]." Defendant Overly said it's the agreement to receive, or the receipt of, the gain, the money in this case, that is the crime."

119    These statements, of course, all clearly misstated the law. The crimes of both bribery and extortion require misconduct by the accused. NRS 197.170 states that for there to be bribery, the accused must have asked for, received, or agreed to receive compensation for official service which is not authorized by law in a manner which would cause a reasonable person to be intimidated into complying with the request.

120    Therefore, to prove bribery or extortion, the Government was required to prove that Coache received extra compensation for his "official service or employment." But Defendants DiGiacomo and Overly knew that Coache received no money for doing anything to assist Lonetti in obtaining his water rights permit.

121     Defendant DiGiacomo knew that the only evidence at trial regarding financial gain by Coache was from the sale of his property interest in Madras to Johnson. Therefore, Defendant DiGiacomo deliberately mislead the jury.

122     Defendant DiGiacomo told the jury there was no question that Johnson was working with Coache. "They're involved in something", he said. This innuendo was wholly improper given that Defendant DiGiacomo knew that Coache and Johnson were co-owners of the Madras Property and nothing more. The statement that "They're involved in something" was obviously meant to imply to the jury that Johnson and Mr. Coache were involved in something **illegal**, which DiGiacomo knew they were not.

123     Defendant DiGiacomo knew that Coache's ownership in Rio Virgin was simply payment from Johnson for the sale of Coache's 60% ownership of Madras. Nevertheless, Defendant DiGiacomo falsely told the jury that Coache's ownership of Rio Virgin LLC made him guilty of money laundering. That was not true; and Defendant DiGiacomo knew it. In fact, he told the Nevada Supreme Court that he had no evidence for any of the crimes for which Coache was convicted.

124     Defendant DiGiacomo showed the contract that was **solely** between Johnson and Lonetti and flat out told the jury that the contract was between Johnson, Lonetti **and Coache**.

125     Defendant DiGiacomo's clear fabrication of facts led the jury to believe that Coache had an interest in wanting the Lonetti application granted. The truth was that Coache had no knowledge or interest in Johnson's agreement with Lonetti or the Lonetti permit.

126     The truth is that Johnson did not seek Coache's assistance at any stage of helping Lonetti. Nor was Coache involved in any transaction at all with Lonetti.

### Defendant DiGiacomo Unlawfully and Maliciously, and Without Any Legal Authority, Altered Jury Instructions

127     Defendant DiGiacomo substantially altered Jury Instruction No. 12 which initially and appropriately set forth the language of NRS 197.170 (1). Without any legal

authority in support thereof, Defendant DiGiacomo added the following language to Jury Instruction No. 12: "A fee or compensation for official service or employment is not authorized by statute for an employee of a public utility to assist in the transfer of any water right to his employer." The unauthorized language was never discussed between the parties, was not agreed to by the Court or any of the parties and had no basis in law or fact.  This language relieved the State of its burden to prove beyond a reasonable doubt of proving every fact necessary to constitute the crime of Extortion beyond a reasonable doubt. Therefore, Defendant DiGiacomo maliciously, purposely, and deliberately deceived the court and mislead the jury.

128    Defendant DiGiacomo substantially altered Jury Instruction No. 15 in reference to the Bribery statute, NRS 197.040.  Without any legal authority in support thereof, Defendant DiGiacomo removed the first full sentence and added the following language to Jury Instruction No. 15: "Compliance with a contract by an employee of a public agency is an official duty."  The unauthorized language was never discussed between the parties, was not agreed to by the Court or any of the parties and had no basis in law or fact.  Therefore, Defendant DiGiacomo maliciously, purposely, and deliberately deceived the court and mislead the jury.

**Defendant DiGiacomo Opposed Coache's Motion for Acquittal Based on Insufficiency of The Evidence**

129    Defendant DiGiacomo knew and admitted to the Nevada Supreme Court that there was insufficient evidence to prove that Coache committed any of the crimes for which he was charged. On November 30, 2016, Coache filed a motion for judgment of acquittal. As a result of Defendant DiGiacomo's vigorous argument against acquittal, the court denied Coache's motion.

130    Coache was forced to endure 12 days of trial on the charges and was then convicted by a jury on November 23, 2016 of "(1) conspiracy to commit extortion by a public officer or employee, (2) extortion by public officer or employee, (3) conspiracy to commit asking [sic] or receiving bribe by public officer, (4) asking or receiving bribe by

public officer, (5) conspiracy to commit money laundering, and (6) money laundering." The Judgment of Conviction was entered on July 3, 2017.

131     Pursuant to the conviction, Coache was sentenced to an aggregate total sentence of 36 months to 96 months with minimum parole eligibility after serving 36 months. Coache was also ordered to pay $1,327,500.00 in restitution to the Virgin Valley Water District.

**Defendants' Actions Caused Coache to Become Incarcerated and His Property Confiscated**

132     Due to the Defendants' illegal actions, Coache was forced to spend sixteen months incarcerated and approximately fourteen months on supervised parole.

133     Due to Defendants' illegal actions, Coache lost his engineer's license.

134     Due to Defendants' illegal actions, the Government confiscated Coache's assets, including a home for which he loaned money to his son to purchase; a home he purchased with Johnson through Rio Virgin, LLC as well as multiple bank accounts; ordered all of his stock on record at Charles Schwab to be sold; and then confiscated the proceeds of those stock sales.

**Coache Appealed His Convictions to the Nevada Supreme Court, Who Exonerated Him**

135     Coache appealed the convictions on February 3, 2017.

136     On May 16, 2018, Coache was released from prison.

137     On July 19, 2019, the Nevada Supreme Court found that a rational trier of fact could not have found the essential elements of Coache's alleged crimes beyond a reasonable doubt, after viewing the evidence in the light most favorable to the prosecution. The Court found that the evidence was truly insufficient to convict Coache and therefore acquitted him of all crimes with which he was charged. A copy of the Order of Reversal is attached as **Exhibit 1**.

138     On August 18, 2019, Coache was discharged from Parole.

//

**Coache Was Damaged by Defendants' Actions**

139     Coache lost over thirty-one months of his life before he was finally exonerated.

140     Coache endured hardships, was deprived of his liberty, and opportunities to live a fulsome, free life.

141     Coache lost the opportunity to spend time with his family, friends, and other loved ones.

142     Coache suffered tremendous damage, including physical injury and emotional distress, as a result of his wrongful arrest, prosecution, detention, and conviction. These harms continue to this day.

## COUNT I: 42 U.S.C. § 1983 – VIOLATION OF THE FOURTEENTH AMENDMENT DUE PROCESS

143     Coache incorporates paragraphs 1 through 145 above, as though full set forth herein.

144     As more fully described above, the Defendants, acting as police investigators and prosecutors, individually, jointly and in conspiracy with each other, deprived Coache of his constitutional right to due process and a fair trial.

145     Detectives Chio and Haynes deliberately gave false and misleading testimony to the jury with the intent to persuade the jury that Coache received a bribe to approve Lonetti's water right application.

146     Detectives Chio and Haynes deliberately gave false and misleading testimony to the jury with the intent to persuade the jury that Coache committed extortion.

147     Detectives Chio and Haynes deliberately gave false and misleading testimony to the jury with the intent to persuade the jury that Coache received $600,000 as a result of bribery and extortion then laundered that money.

148     Defendant Special Assistant District Attorney DiGiacomo prosecuted a criminal case against Coache, knowing that Coache had committed no crimes. Defendant DiGiacomo did so by presenting false and misleading facts to the jury. Defendant DiGiacomo fabricated and solicited false evidence, including witness statements and testimony he knew to be false. Defendant DiGiacomo without any legal authority substantially altered multiple Jury Instructions to maliciously, purposely, and deliberately deceived the court and mislead the jury.

149     Defendants' actions subjected Coache to governmental action that shocks the conscience in that Defendants deliberately and intentionally framed Coache for a crime of which he is totally innocent.

150     Defendants' misconduct contravened fundamental canons of decency and fairness and violated Coache's rights under the Fourteenth Amendment.

151      Defendants' misconduct directly resulted in the unjust, unconstitutional, and wrongful criminal conviction of Coache, thereby denying him his constitutional right to due process and a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Coache could not and would not have been pursued, and he would not have been convicted.

152     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others.

153     The Defendants were acting under color of law and within the scope of their employment when they took these actions.

154     As a result of the Defendants Chio and Haynes' misconduct described in this Count, Coache suffered loss of liberty, loss of income, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

155     Upon information and belief, the Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of the LVMPD and Clark County, in the manner more fully described herein.

//

## COUNT II: 42 U.S.C. § 1983 – VIOLATION OF THE FOURTH AMENDMENT DETENTION WITHOUT PROBABLE CAUSE AND DEPRIVATION OF LIBERTY

156     Coache incorporates paragraphs 1 through 158 above, as though full set forth herein.

157     Defendants, individually, jointly, and in conspiracy with each other, accused Coache of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Coache without any probable cause for doing so and in spite of the fact that they knew Coache was innocent.

158     In so doing, the Defendants caused Coache to be unreasonably seized without probable cause and deprived of liberty, in violation of Coache's rights secured by the Fourth Amendment.

159     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others.

160     The Defendants were acting under color of law and within the scope of their employment when they took these actions.

161     As a result of Defendants' misconduct described in this Count, Coache suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

162     Upon information and belief, the Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of the LVMPD and Clark County, in the manner more fully described herein.

## COUNT III: 42 U.S.C. § 1983 – FAILURE TO INTERVENE

163     Coache incorporates paragraphs 1 through 165 above, as though full set forth herein.

164     In the manner described more fully above, during the constitutional violations described herein, Defendants each stood by without intervening to prevent the violation of Coache's constitutional rights, even though they had the opportunity to do so.

165     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others.

166     The Defendants were acting under color of law and within the scope of their employment when they took these actions.

167     As a result of Defendants' misconduct described in this Count, Coache suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### COUNT IV: 42 U.S.C. § 1983
### CONSPIRACY TO DEPRIVE CONSTITUTIONAL RIGHTS

168     Coache incorporates paragraphs 1 through 170 above, as though full set forth herein.

169     Prior to Coache's conviction, Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Coache for a crime he did not commit and thereby to deprive him of his constitutional rights, all as described in this Complaint.

170     Defendants agreed to investigate and to exert influence to cause the prosecution of Coache for a crime he did not commit and took overt actions in conformity with that agreement.

171     As further described above, the Defendants agreed to fail to disclose exculpatory evidence and then, to further conceal their acts, fabricate evidence against

Coache in a number of ways, including giving false testimony and presenting false evidence.

172    In so doing, the Defendants agreed to accomplish an unlawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability by depriving Coache of these rights.

173    In furtherance of their conspiracy, the Defendants committed overt acts and were otherwise willful participants in joint activity.

174    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others.

175    As a result of the Defendants misconduct described in this Count, Coache suffered loss of liberty, loss of income, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VI
## 42 U.S.C. § 1983 – POLICY & CUSTOM CLAIMS
### Against LVMPD

176    Coache incorporates paragraphs 1 through 178 above, as though full set forth herein.

177    Coache's injuries described in this complaint and the violations of his Constitutional rights discussed above were caused by the policies and customs of the Las Vegas Metropolitan Police Department, as well as by the actions of policy-making officials for the Las Vegas Metropolitan Police Department.

178    At all times relevant to the events described in this complaint and for a period of time before and after, the Las Vegas Metropolitan Police Department failed to promulgate proper or adequate rules, regulations, policies, and procedures governing the conduct of investigations, the collection of evidence, material exculpatory evidence and impeachment evidence, and information bearing upon the credibility of both lay and law-

enforcement witnesses; writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; the conduct of eyewitness identification procedures; the maintenance of investigative files and disclosure of those files in criminal proceedings.

179     In addition or alternatively, the Las Vegas Metropolitan Police Department failed to promulgate proper and adequate rules, regulations, policies, procedural safeguards, and procedures for the training and supervision of officers and agents of the Department, with respect to investigations, the production and disclosure of evidence, including physical evidence, material exculpatory evidence and impeachment evidence, and information bearing upon the credibility of both lay and law-enforcement witnesses and evidence; the writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and the maintenance of investigative files and disclosure of the files in criminal proceedings.

180     Officers and agents of the Las Vegas Metropolitan Police Department committed these failures to promulgate proper or adequate rules, regulations, policies, and procedures.

181     Had officers and agents of the Las Vegas Metropolitan Police Department promulgated appropriate policies, then the violation of Coache's constitutional rights would have been prevented.

182     These practices and customs, individually and/or together, were allowed to flourish because the leaders, supervisors, and policymakers of the Las Vegas Metropolitan Police Department directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees in the areas identified above and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses like those affecting Coache.

183     The above practices and customs, so well settled as to constitute de facto policies of the Las Vegas Metropolitan Police Department, were able to exist and thrive,

individually and/or together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

184    In addition, the misconduct described in this count was undertaken pursuant to the Las Vegas Metropolitan Police Department policies and practices in that the constitutional violations committed against Coache were committed with the knowledge, approval, or endorsement of persons with final policymaking authority for the Department or were actually committed by persons with such final policymaking authority.

185    As a consequence, the final policymakers for the Las Vegas Metropolitan Police Department approved of, adopted, and therefore ratified the actions of the Defendant Officers, including their violations of Coache's constitutional rights, making the Las Vegas Metropolitan Police Department liable for this misconduct.

186    Plaintiff's injuries and the constitutional violations he suffered were caused by officers, agents, and employees of the Las Vegas Metropolitan Police Department, including but not limited to the Defendant Officers, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this count.

## COUNT VI: MALICIOUS PROSECUTION

187    Coache incorporates paragraphs 1 through 189 above, as though full set forth herein.

188    In the manner described more fully above, Defendants, acting as investigators, individually, jointly, and in conspiracy with each other, and maliciously, instituted or continued the prosecution of Coache without probable cause. As a consequence of the criminal prosecution, Coache was unlawfully seized, deprived of liberty, and wrongfully convicted of a crime of which he is innocent.

189    Coache's criminal prosecution was terminated in his favor in a manner indicative of innocence.

190    The Defendants were acting under color of law and within the scope of

their employment when they took these actions.

191     Through the doctrine of respondeat superior, Defendant LVMPD and Clark County are liable as principals for all torts committed by its employees or agents, including the misconduct by the Defendants.

192     As a direct and proximate result of the Defendants' actions, Coache's rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VII: ABUSE OF PROCESS

193     Coache incorporates paragraphs 1 through 195 above, as though full set forth herein.

194     In the manner more fully described above, Defendants, through the actions described more fully above, procured, and exerted influence to continue a criminal proceeding against Coache, with an ulterior purpose other than resolving a legal dispute or resolving the guilt or innocence of Coache.

195     Defendants also committed willful acts in the use of the legal process which were not proper in the regular conduct of Plaintiff's criminal proceeding.

196     The Defendants were acting under color of law and within the scope of their employment when they took these actions.

197     Through the doctrine of respondeat superior, Defendants LVMPD and Clark County are liable as principals for all torts committed by its employees or agents, including the misconduct by the Defendants.

198     As a direct and proximate result of the Defendants' actions, Plaintiff's rights were violated and Coache suffered injuries and damages, including but not limited to loss of liberty, loss of income, physical injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

//

## COUNT VIII:

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

199     Coache incorporates paragraphs 1 through 145 above, as though full set forth herein.

200     In the manner described more fully above, Defendants, individually, jointly, and in conspiracy with each other, engaged in extreme and outrageous conduct with the intention of, or with reckless disregard for, causing Coache emotional distress, and Coache suffered severe or extreme emotional distress. Defendants' misconduct was the actual and proximate cause of Coache's severe or extreme emotional distress.

201     The Defendants were acting under color of law and within the scope of their employment when they took these actions.

202     Through the doctrine of respondeat superior, Defendants LVMPD and Clark County are liable as a principal for all torts committed by its employees and agents, including the misconduct by Defendants described in this Count.

203     As a direct and proximate result of the Defendants' actions, Coache's rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, loss of income, physical injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT IX: CIVIL CONSPIRACY

204     Coache incorporates paragraphs 1 through 206 above, as though full set forth herein.

205     In the manner described more fully above, Defendants, acting in concert with other known and unknown co-conspirators conspired and intended by concerted action to accomplish an unlawful objective for the purpose of harming Coache, which resulted in damage to him. Defendants agreed to investigate and cause the prosecution of

Plaintiff for a crime he did not commit and took overt actions in conformity with that agreement.

206    In furtherance of the conspiracy, the Defendants committed overt acts and were otherwise willful participants in joint activity.

207    The Defendants were acting under color of law and within the scope of their employment when they took these actions.

208    Through the doctrine of respondeat superior, Defendants LVMPD and Clark County DA are liable as principals for all torts committed by its employees or agents, including the misconduct by the Defendants described in this Count.

209    As a direct and proximate result of the Defendants' actions, Coache's rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, loss of income, physical injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT X: INDEMNIFICATION

210    Coache incorporates paragraphs 1 through 212 above, as though full set forth herein.

211    Nevada law provides that LVMPD and Clark County are directed to pay any tort judgment for compensatory damages for which their employees are liable within the scope of their employment activities.

212    Defendants were employees of the Defendant LVMPD and Clark County and acted within the scope of their employment at all times relevant in committing the actions and omissions described herein.

WHEREFORE, Plaintiff Robert Coache requests that this Court enter a judgment in his favor and against Defendants LAS VEGAS METROPOLITAN POLICE DEPARTMENT, COLIN HAYNES, NATHAN CHIO, CLARK COUNTY, MARC DIGIACOMO and SARAH E. OVERLY, awarding compensatory damages, costs, and attorneys' fees against each Defendant and punitive damages against the individual

Defendants, in the amount of at least FIVE MILLION DOLLARS, as well as any other relief this Court deems appropriate.

**JURY DEMAND**

Plaintiff Robert Coache requests a trial by jury for all claims for relief.

**DATED** this 13th day of July 2021.


Ralph A. Schwartz P.C


/s/ *Ralph A. Schwartz*
RALPH A. SCHWARTZ, ESQ.
Nevada Bar No. 5488
**Ralph A. Schwartz, PC**
400 S. 7th Street, Suite 100
Las Vegas, NV 891091
Tel:    (702) 888-5291
Fax:    (702) 888-5292
 Email: ralphschwartz@yahoo.com


Brown Clark Le Ames Stedman & Cevallos, LLP


/s/  *Edwin B. Brown*
EDWIN B. BROWN ESQ., (Pro Hac Vice Pending)
California Bar No. 89447
**BROWN CLARK LE AMES STEDMAN & CEVALLOS, LLP**
225 Hospitality Lane, Suite 314
San Bernardino, CA 92408
Phone: (909) 890-5770
Email: mcpclark@clark-le.com

Attorneys for Plaintiff ROBERT COACHE