**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

| | |
|---|---|
| ROBERT COACHE, | Case No. 2:21-cv-01334-RFB-BNW |
| Plaintiff, | **ORDER** |
| v. | |
| LAS VEGAS METROPOLITAN POLICE DEPARTMENT et al., | |
| Defendants. | |

Before the Court are motions to dismiss the Amended Complaint (ECF No. 58) by Defendant Marc DiGiacomo, ECF No. 61, and Defendants Colin Haynes and Nathan Chio, ECF No. 62. For the reasons stated below, the Court grants both motions.

## I.    FACTUAL ALLEGATIONS

Plaintiff Robert Coache makes the following allegations in support of his Amended Complaint and his opposition to the Defendants' motions to dismiss.

### A.  The Water Right Exchange

In Nevada, the State Engineer ("SE") has sole statutory authority to issue water permits to divert water from all sources in the state except the Colorado River. Water from the Colorado River is governed by federal law and interstate agreements.

The water permit process involves multiple steps: (1) an application is submitted that identifies a point to divert public water from, specifies the beneficial use of the water, and requests a specific quantity of water for that use from that source; (2) a "ready for action" committee makes a recommendation to the SE on applications; (3) the SE considers the application using codified

criteria.[1] Once an application is granted and the requisite fee paid, the right is owned. The owner must divert the water and apply it to the beneficial use for a period of at least a year within five years of issuance to perfect the right. When proof of perfection is filed with the SE, the right becomes certified. Permits can be bought and sold at any stage of the process prior to certification. In Nevada, senior water rights, that is those whose application was filed earlier, must be satisfied prior to more junior rights. Absent water restrictions, seniority is generally of no use.

From 1989 to 1994, the Southern Nevada Water Authority ("SNWA") filed multiple application to the SE to secure water for the population of Clark County. In 1994, the SE issued Ruling 4151 which allocated all remaining unappropriated water from the Virgin River to SNWA.

Coache worked for the State Engineer's Office ("SEO") from 1981 to 2010. At the end of his career with the SEO, he was a deputy state engineer and chief engineer for the southern Nevada branch of the SEO. Coache lacked the statutory authority to issue permits.

Michael Johnson was a friend of Coache who, at the relevant times, was employed by the Virgin Valley Water District ("VVWD"). VVWD is a water utility with water rights, including to water from the Virgin River. Johnson performed consulting work to drill wells and secure groundwater rights in Southern Nevada. In 2004, Coache and Johnson together purchased 40 acres of land ("the property") near the Virgin River for $70,000. Coache took a 60 percent ownership stake and Johnson took 40 percent.

Johnson met John Lonetti in the 1990s. Johnson consulted for Lonetti on understanding and developing Lonetti's water rights. Lonetti owned water rights related to the Virgin River and Application 54383 ("the water application") which had been pending before the SEO since 1990. The application was senior to Ruling 4151's appropriation of unallocated water from the Virgin River. The then-SE testified that the application had fallen through the cracks.

On January 4, 2006, the SE sent Lonetti a letter asking whether he remained interested in the application. Lonetti consulted with Johnson and informed the SE he wished to secure the application. In February 2007, Lonetti and Johnsons' company Rio Virgin, LLC executed an

---

[1] In general, a proper water application must be approved unless otherwise provided by statute. See NRS 533.0241, .370, .345, .372, .503.

agreement for services related to Lonetti's water rights and the application in exchange for partial

ownership of each water right and the permit. Coache was not involved in this or any transaction

with Lonetti nor was his assistance sought by Johnson; Coache had not spoken with or met Lonetti

until 2012. The application was granted on June 29, 2007. At the time, Coache worked in the

SEO's Las Vegas office and was unaware of Lonetti's application being granted.

In December 2007, Nevada, the federal government, and the six other states along the

Colorado River entered into an agreement that *inter alia* created Intentionally Created Surplus as

a new class of water. Using this classification, SNWA gained the ability to take water rights from

the Virgin River and Muddy River, both upriver tributaries of the Colorado River, and, by allowing

it to flow into Lake Mead, use that water for their purposes. The new agreement only applies to

water rights created before the 1929 Boulder Canyon Project Act.

Lonetti owned a permit for a pre-1929 water right from the Virgin River alongside the

newer 1990 permit. In January 2008, SNWA expressed interest in purchasing Lonetti's pre-1929

water right but not his 1990 water right. Johnson suggested to SNWA that it buy both permits and

trade the 1990 water right to VVWD for pre-1929 water shares to the Virgin River that VVWD

owned. The result would be: SNWA gaining pre-1929 water rights, VVWD gaining more volume

of water rights, and SMWA paying Lonetti $8.4 million.

SNWA, VVWD, and Lonetti agreed to the transaction and, on May 20, 2008, SNWA paid

Lonetti for the permits. Lonetti then paid Rio Virgin $1.3 million pursuant to their consulting

agreement. Coache was not involved in this sale or exchange of water rights.

In May 2008, Johnson and Coache's property was valued at $1,040,000. Coache agreed to

sell his share of the property to Johnson for $600,000. When Rio Virgin received its funds, Johnson

and Coache exchanged 50 percent of Rio Virgin for Coache's 60 percent of the property. Between

2008 and 2010, Coache used his $600,000 of Rio Virgin's bank for investment and personal

reasons. Coache declared the income on his tax returns. In 2010, Coache and Johnson decided to

divest their joint investments from Rio Virgin and later Rio Virgin was dissolved.

**B.  The Criminal Investigation of Coache**

Generally, LVMPD will investigate whether a crime was committed and send those

findings to the District Attorney, who will decide if charges should be filed. Here, despite being a Deputy District Attorney, Defendant DiGiacomo personally initiated and controlled the investigation of Coache. DiGiacomo took several investigative steps and was assisted in this by Defendants Chio and Haynes. This is highly unusual for a Deputy District Attorney.

First, on October 11, 2010, he met with members of the VVWD board of directors and VVWD's attorney Bo Bingham. Bingham and the VVWD board members provided DiGiacomo with the allegations to file charges against Coache. They told DiGiacomo that Coache assisted Lonetti and Johnson to get the application approved and that Lonetti paid a bribe to Coache and Lonetti to influence the SE. Bingham told DiGiacomo to focus on the finances in the case.

Second, DiGiacomo told Defendant Haynes to determine from whom Coache received the money. Chio wrongly told Haynes that Lonetti paid a $1.3 million bribe to Coache and Johnson, which Haynes adopted to secure subpoenas. Chio and Haynes identified Coache's legitimate payments using his proceeds from Rio Virgin but, without evidence, identified the investments as an attempt to launder the money. Haynes failed to follow up on exculpatory evidence, including evidence that Coache's money came from a legitimate land sale. Further, while investigating, Haynes found a folder with "Lonetti" on it. However, he failed to follow up to identify that this folder was given to Coache by a friend whose father worked for the SE, was dated to 1995, and had nothing to do with the application's approval.

Third, DiGiacomo was involved in and relied upon a civil case against Coache. Before Coache was charged, VVWD sued Johnson. However, after Coache was charged, Bingham added Coache and Lonetti as defendants. A guilty verdict against Coache would help VVWD recover significant money in the civil case. DiGiacomo testified during an evidentiary hearing in the civil action that the facts in that case were the same as the criminal case. DiGiacomo relied upon Bingham and materials from the civil case to build the criminal case. Further, DiGiacomo deferred to Bingham as an expert on water law, despite Bingham admitting to not being an expert on water law. Ultimately, Coache would be dismissed from the civil case as no testimony could establish his involvement.

Fourth, DiGiacomo made false statements to a grand jury, including that Coache was the

SE, and but for those statements, no subpoena would have been issued. In the subpoena, DiGiacomo falsely stated that Coache approved water permits, despite being told that he had not.

Fifth, in May 2011, DiGiacomo wrote the 12-page criminal complaint and Defendant Chio wrote the arrest warrant for Coache. By this point, DiGiacomo knew that Coache had not influenced the SE to issue the warrant nor receive money from Lonetti.

Sixth, in November 2011, DiGiacomo later interviewed Lonetti. Lonetti told DiGiacomo that he only paid a commission to Johnson and that he did not know Coache. DiGiacomo and Chio both participated recorded the statement. After, Chio discussed next steps for the investigation with DiGiacomo.

Seventh, DiGiacomo and Chio repeatedly failed to follow up on exculpatory evidence. Chio interviewed the SE who issued the permit and multiple members of the SEO who provided testimony that Coache was not and could not have been involved in approving the application. Chio was told that Coache sold his stake in the property to receive the funds at issue. On August 30, 2011, Coche's defense attorney identified exculpatory evidence to DiGiacomo, including testimony of two SEs that Coache never spoke with them and that Coache was not part of the approval process for the application. Chio knew that Coache was not a party to the consulting agreement but failed to follow up on that exculpatory evidence. Later, DiGiacomo would tell the Nevada Supreme Court that he was unable to establish what Coache did to receive the money at issue nor was he able to establish what Coache did to influence the permit. The results of this investigation were used to convict Coache.

DiGiacomo prosecuted the case vigorously. At trial, no evidence was presented regarding Coache receiving money from an illegal source nor having any communication regarding the application or its later sale. Coache was convicted on November 23, 2016. He was sentenced to 36 to 96 months and ordered to pay VVWD $1.3 million. Coache appealed on February 2, 2017, and DiGiacomo vigorously defended the conviction on appeal. On May 16, 2018, Coache was released from prison. On July 19, 2019, the Nevada Supreme Court found that, viewing the evidence in the light most favorable to the prosecution, the essential elements of the crimes could not have been found by a reasonable jury beyond a reasonable doubt.

1    Coache was incarcerated for 16 months. He lost his license and suffered government

2    confiscation of his property. Coache was discharged from parole on August 18, 2019.

3

4    **II.    PROCEEDURAL HISTORY**

5    On July 14, 2021, Plaintiff Coache filed a Complaint. ECF No. 1. In the complaint, Coache

6    named the Las Vegas Metropolitan Police Department ("LVMPD"), Clark County, Marc

7    DiGiacomo, Colin Haynes, Nathan Chio, among others. Id. Defendants filed motions to dismiss

8    the Complaint. ECF Nos. 29, 33. The motions were fully briefed, and, on September 14, 2022, a

9    hearing was held. ECF Nos. 38, 39, 41, 43, 49, 54. At the hearing, dismissed the complaint

10   regarding LVMPD and Clark County with prejudice and regarding all other defendants without

11   prejudice. ECF No. 54. The Court granted Coache leave to amend within 30 days. Id.

12   Coache filed an Amended Complaint on November 1, 2022, naming just DiGiacomo,

13   Haynes, and Chio as defendants. ECF No. 58. On November 29, 2022, both Defendant DiGiacomo

14   and Defendants Chio and Haynes filed motions to dismiss the amended complaint. ECF Nos. 61,

15   62. The motions were fully briefed, and the Court held a hearing on August 16, 2023. ECF Nos.

16   68-69, 71-74. The Court then took the motions under submission. ECF No. 74.

17

18   **III.    LEGAL STANDARD**

19   An initial pleading must contain "a short and plain statement of the claim showing that the

20   pleader is entitled to relief." Fed. R. Civ. P. 8(a). The court may dismiss a complaint for "failure

21   to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In ruling on a motion

22   to dismiss, "[a]ll well-pleaded allegations of material fact in the complaint are accepted as true and

23   are construed in the light most favorable to the non-moving party." Faulkner v. ADT Sec. Services,

24   Inc., 706 F.3d 1017, 1019 (9th Cir. 2013) (citations omitted).

25   To survive a motion to dismiss, a complaint need not contain "detailed factual allegations,"

26   but it must do more than assert "labels and conclusions" or "a formulaic recitation of the elements

27   of a cause of action . . . ." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp.

28   v. Twombly, 550 U.S. 544, 555 (2007)). In other words, a claim will not be dismissed if it contains

- 6 -

1    "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face,"

2    meaning that the court can reasonably infer "that the defendant is liable for the misconduct

3    alleged." Id. at 678 (internal quotation and citation omitted).

4        The Ninth Circuit, in elaborating on the pleading standard described in Twombly and Iqbal,

5    has held that for a complaint to survive dismissal, the plaintiff must allege non-conclusory facts

6    that, together with reasonable inferences from those facts, are "plausibly suggestive of a claim

7    entitling the plaintiff to relief." Moss v. U.S. Secret Service, 572 F.3d 962, 969 (9th Cir. 2009).

8

9    **IV.    DISCUSSION**

10       This case turns on the events surrounding the investigation and prosecution of Coache.

11   Coache asserts three federal and three state claims. Under 42 U.S.C. § 1983, Coache argues the

12   three Defendants violated Coache's Fourteenth Amendment right to due process and a fair trial

13   (Count I) and Coache's Fourth Amendment right to be free from arbitrary detention (Count II), as

14   well as engaging in a conspiracy to deprive Coache's Constitutional rights (Count III).[2] Coache

15   further brings three claims under Nevada law, namely: Malicious Prosecution (Count IV), Abuse

16   of Process (Count V), and Intentional Infliction of Emotional Distress (Count VI).[3]

17       For the reasons below, the Court finds that Coache's federal and state claims are

18   insufficiently pleaded.

19       **A.  Coache's Federal Claims**

20       Coache brings three federal claims under § 1983. To assert a § 1983 claim, a person must

21

22       [2] To the extent that Coache brings a malicious prosecution claim under 42 U.S.C. § 1983,
     that claim fails for the same reason discussed infra regarding Coache's Fourth Amendment claim
23   does—probable cause was present in this case. Awabdy v. City of Adelanto, 368 F.3d 1062, 1066.
     "In order to prevail on a § 1983 claim of malicious prosecution, a plaintiff 'must show that the
24   defendants prosecuted [him] with malice and without probable cause, and that they did so for the
     purpose of denying [him] equal protection or another specific constitutional right.'" Id. (quoting
25   Freeman v. City of Santa Ana, 68 F.3d 1180, 1189 (9th Cir. 1995)).

26       [3] Coache also asserts as Count VII a claim of "Indemnification," where he presents that
     "Nevada law provides that LVMPD and Clark County are directed to pay any tort judgement for
27   compensatory damages for which their employees are liable within the scope of their employment
     activities." ECF No. 58 at 39. This appears to reference Nevada Revised Statute § 41.0349, which
28   provides for the indemnification of state officers after their losses in civil suits, which does not
     apply under the facts of this case.

1   allege that an officer acting under color of law violated the person's constitutional rights. <u>Borunda</u>

2   <u>v. Richmond</u>, 885 F.2d 1384, 1391 (9th Cir. 1989). Absolute immunity bars certain conduct from

3   being the basis of a § 1983 claim. <u>Imbler v. Pachtman</u>, 424 U.S. 409 (1976).

4          The Court first reviews the extent that absolute immunity applies in this case before turning

5   to each § 1983 claim in turn. Because the Court finds that Coache has insufficiently pleaded each

6   of the claims, the Court need not consider Defendants' qualified immunity arguments.

7                          i.   <u>Absolute Immunity</u>

8          To the extent that the federal claims aver liability for conduct related to judicial

9   proceedings, those claims are barred by absolute immunity. <u>See</u> <u>Imbler</u>, 424 U.S. at 424 (extending

10   absolute immunity for prosecutors to suits under Section 1983). To determine whether conduct is

11   covered by absolute immunity, the Court must look to the nature of the function performed. <u>Kalina</u>

12   <u>v. Fletcher</u>, 522 U.S. 118, 127 (1997). Absolute immunity applies when prosecutors perform the

13   traditional functions of an advocate but not administrative functions or investigative functions.

14   <u>Genzler v. Longanbach</u>, 410 F.3d 630, 636 (9th Cir. 2005) (citing <u>Kalina</u>, 522 U.S. at 126). The

15   imposition of absolute immunity is an "extreme remedy" justified only where "any lesser degree

16   of immunity could impair the judicial process itself." <u>Lacey v. Maricopa Cnty.</u>, 693 F.3d 896, 912

17   (9th Cir. 2012) (quoting <u>Kalina</u>, 522 U.S. at 127). The official seeking absolute immunity bears

18   the burden of showing that such immunity is justified for the function in question. <u>Burns v. Reed</u>,

19   500 U.S. 478, 486 (1991).

20          The Court finds that DiGiacomo's alleged conduct related to judicial proceedings,

21   including his alleged conduct before the grand jury, in preparation for trial, during trial, and on

22   appeal are traditional functions of an advocate and, thus, covered by absolute immunity. <u>Genzler</u>,

23   410 F.3d at 636; <u>see also</u> <u>Imbler</u>, 424 U.S. at 431 (holding absolute immunity applies for

24   allegations concerning the knowing use of perjured testimony and suppression of material facts at

25   trial); <u>Ray v. Lara</u>, 31 F.4th 692, 699 (9th Cir. 2022) (holding that absolute immunity applies for

26   writing the appellate brief on behalf of the government in a direct appeal in a criminal case).

27   <u>Sanders v. City & Cnty. of San Fransisco</u>, 226 Fed. Appx. 687, 690 (9th Cir. 2007) (affirming a

28   district court finding of absolute immunity for "engaging in 'malicious prosecution' by convening

1    a grand jury and securing an indictment despite lacking probable cause).

2         DiGiacomo's conduct prior to and during the seeking of the arrest warrant can fall within

3    absolute immunity so long as he was performing traditional prosecutorial functions. Compare

4    Burns, 500 U.S. at 487 (holding that a prosecutor's "appearance as a lawyer for the State in [a]

5    probable-cause hearing, where he examined a witness and successfully supported the application

6    for a search warrant" is within the scope of prosecutorial immunity) with Kalina, 522 U.S. at 131

7    (holding a prosecutor's swearing to facts in a certification in support of an arrest warrant is not

8    covered by absolute immunity).

9         Regarding Coache's allegations that Chio and Haynes furnished false testimony at trial and

10   before the grand jury, the Court finds that absolute immunity also extends to that conduct. Cruz v.

11   Kauai Cnty., 279 F.3d 1064, 1067 (9th Cir. 2002) ("Immunity determinations . . . rest on 'the

12   nature of the functions performed, not the identity of the actor who performed it.") (quoting Kalina,

13   522 U.S. 127; Briscoe v. LaHue, 460 U.S. 325, 335-36 (1983) ("When a police officer appears as

14   a witness, he may reasonably be viewed as acting like any other witness sworn to tell the truth—

15   in which even he can make a strong claim to witness immunity.").

16        The Court finds that Coache's remaining allegations—that is, those concerning

17   DiGiacomo's non-prosecutorial conduct and Chio and Haynes non-witness conduct—are not

18   shielded by absolute immunity and can be used for liability.

19              ii.   Count I: Deliberate Fabrication

20        Coache claims that Defendants deliberately fabricated evidence against him. At this stage,

21   Coache must plead sufficient facts that accepted as true establish that (1) the Defendants official

22   deliberately fabricated evidence and (2) the deliberate fabrication caused the plaintiff's deprivation

23   of liberty. See Costanich v. Dep't of Soc. & Health Servs., 627 F.3d 1101, 1111 (9th Cir. 2009).

24   The second element requires the act at issue be both the cause-in-fact and the proximate cause of

25   the deprivation of liberty. Spencer v. Peters, 857 F.3d 789, 798 (9th Cir. 2017). The existence or

26   absence of probable is relevant only for its impact, if any, of the causation analysis. See id. at 802.

27        Plaintiff alleges that Defendants, working together, suppressed exculpatory evidence and

28   fabricated evidence to support their investigation of Coache. Primarily, Coache points to

statements in the arrest warrant that were allegedly contradicted by exculpatory evidence. For example, that Defendant Chio presented in the arrest warrant that Coache abused his position in the SEO, despite knowing that the SE did not consult with Coache. In addition, Plaintiff alleges that Haynes was unqualified to carry out the financial investigation and that Defendant's reliance on Bingham's office for legal advice and discovery was wrongful.

Defendants argue that Coache conflates the presence of evidence that could suggest innocence with evidence that establishes innocence. Defendants further argue that any alleged fabrications were nullified by the issuance of the warrant on sufficient probable cause.

Even assuming <u>arguendo</u> that Coache has sufficiently alleged that Defendants fabricated evidence, the Court finds that his deliberate fabrication claim fails as a matter of law on the causation prong for two reasons.

First, regarding the alleged fabrication of evidence for the arrest warrant, that analysis falls under the Fourth Amendment claim analyzed below. See <u>Hervey v. Estes</u>, 65 F.3d 784, 789 (9th Cir. 1995); <u>Spencer</u>, 857 F.3d at 802. For purposes of causation, as discussed at length below, since probable cause existed despite any alleged fabrications, the causal link between the alleged false evidence in the warrant application and Coache's alleged constitutional deprivation is broken.

Second, Coache fails to establish how any alleged fabricated evidence resulted in his loss of liberty. Indeed, Coache's allegations stand for the opposite. Coache summarizes that at trial:

> "the Government presented no evidence that Coache did anything to assist the granting of Lonetti's permit or assist in the three-way trade . . . . that [any party] paid <u>any</u> money to Coache . . . . that Coache every obtained any money from any illegal source . . . . that Coache had any communications, let alone agreements, with anyone at the state engineer's office regarding Lonetti's water rights."

These allegations speak to a lack of evidence but not the fabrication of evidence. The Court further takes notice of the Nevada Supreme Court's opinion in Coache's criminal appeal, where it stated:

> "Although Coache's conduct may have been unethical and constituted self-dealing, we are not convinced that a rational juror could reasonably find, beyond a reasonable doubt, that Coache committed the charged offenses based on the evidence presented at trial. . . . Having found insufficient evidence for all of Coache's convictions we . . . order the judgement of the conviction reversed."

Coache v. State, No. 72397, 2019 Nev. Unpub. LEXIS 810, at *2, *6 (2019). In short, the Court finds that no false evidence made it to trial and, thus, any fabricated evidence did not impact the disposition of the case. That the jury erred in convicting Coache is a regrettable outcome, but it is not one that Coache can show to be caused by Defendants' conduct.[4]

### iii. Count II: Detention Without Probable Cause

Coache argues in Count II that Defendant's violated his Fourth Amendment right to be free of detention without probable cause by fabricating evidence used to secure a warrant for his arrest. A person can challenge an arrest pursuant to an improperly issued warrant under § 1983. Malley v. Briggs, 475 U.S 335, 338-42 (1986). To establish a Fourth Amendment violation where officers allegedly have included false information in a warrant affidavit, "the plaintiff must establish that the remaining information in the affidavit is insufficient to establish probable cause." Hervey v. Estes, 65 F.3d 784, 789 (9th Cir. 1995).

To maintain a false arrest claim on a theory that the magistrate was deceived, "a plaintiff must show that the officer who applied for the arrest warrant 'deliberately or recklessly made false statements or omissions that were material to the finding of probable cause.'" Smith v. Almada, 640 F.3d 931, 937 (9th Cir. 2011)) (quoting KRL v. Moore, 384 F.3d 1105, 1117 (9th Cir. 2004)). That is, Coache must plead sufficient material facts that, if true, (1) establish that the warrant affidavit contained misrepresentations or omissions material to the finding of probable cause and (2) make a substantial showing that the misrepresentations or omissions were made intentionally or with reckless disregard for the truth. See Butler v. Elle, 281 F.3d 1014, 1024 (9th Cir. 2002); Bravo v. City of Santa Maria, 665 F.3d 1076, 1083 (9th Cir. 2011). If probable cause remains after the warrant affidavit is corrected and supplemented, no constitutional error has occurred. See Bravo, 665 F.3d at 1084.

No warrants shall issue, but upon probable cause, supported by oath or affirmation. U.S. Const. amend IV. In contrast to the heavy and technical beyond a reasonable doubt standard, probable cause involves "the factual and practical considerations of everyday life on which

---

[4] As discussed above, to the extent that Coache argues that DiGiacomo misled the jury as to the sufficiency of the evidence, DiGiacomo is absolutely immune. Imbler, 424 U.S. 409.

reasonable and prudent men, not legal technicians, act." Brinegar v. United States, 338 U.S. 160, 174-75. "Probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Illinois v. Gates, 462 U.S. 213, 244 n.13 (1983); see also Gerstein v. Pugh, 420 U.S. 103, 102 n.21 (1975) (stating the probable cause standards are identical for search warrants and arrest warrants).

Coache argues that the magistrate would not have issues the arrest warrant but for Defendant's alleged falsehoods and omissions. To support this, Coache makes several factual allegations regarding Defendant Chio's warrant affidavit, including: (1) that it falsely stated Coache abused his position in the SEO since the SE told Chio he did not remember consulting with Coache; (2) that nobody told Chio that Coache was involved with the permit; (3) that SE's must "by law" approve permits like Lonetti's application; (4) that there was no evidence directly showing Lonetti paying Coache; and (5) that Coache earned the money at issue through a real estate transaction.

Defendants argue that undisputed information contained in the warrant affidavit establish legally sufficient proof to believe that Coache committed at least one crime.  Defendants point to undisputed circumstantial evidence, such as Coache's listing as a joint owner on the bank account that received the funds from Lonetti and that Coache used those funds. Defendants further argue that each statement in the warrant affidavit is supported by evidence.

As a threshold matter, the Court finds the warrant is incorporated by the complaint through repeated reference. See Khoja v. Orexigen Therapeutics, 899 F.3d 988 (9th Cir. 2018). The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken their claims. Id. at 1002 (citing Parrino v. FHP, Inc., 146 F.3d 699, 706) (9th Cir. 1998). Coache extensively relies upon the warrant to establish the alleged falsity of the evidence relied upon by Defendants.

Upon a review of the warrant adjusted for the alleged falsifications and omissions, the Court finds that probable cause existed to support Coache's arrest. What follows is a summary of the most material portions of a warrant adjusted to accommodate Coache's objections:

1) Chio and others spoke with three members of the VVWD board and Bingham.

- 12 -

During those conversations they were told that Johnson admitted to the board that, while employed at VVWD and in violation of his contract, he consulted for Lonetti regarding the three-way water rights deal. Chio also reported that Johnson said he was paid thousands of dollars, refused to elaborate, and resigned.

2)  At that meeting, Bingham told investigators that Johnson had a close relationship with a former Deputy State Engineer—Coache—and that there were rumors that Johnson had used this relationship to his advantage to facilitate several transactions in the past.

3)  Bingham also said that Johnson and Coache had an LLC together, where they bought and sold real estate together.

4)  VVWD asked LVMPD to investigate the allegations.

5)  Police records identified Johnson, Coache, Lonetti, and a fourth person mentioned by VVWD as potentially involved.

6)  Subpoenaed records confirmed Johnson's position at VVWD and Coache's position at the SEO.

7)  Chio spoke with the General Counsel for SNWA, received a copy of the three-way water deal. Chio was told that Johnson contacted SNWA, represented that he was acting as a representative of VVWD and a public employee, and negotiated the terms of the three-way deal.

8)  Haynes investigated Johnson and Lonetti's LLC and found that Coache was a registered agent.

9)  Haynes obtained a subpoena for files on a property owned by the LLC and found a copy of the operating agreement of the LLC that detailed Coache and Johnson were equal partners. The home was priced at $139,000 and was paid for by a wire from Rio Virgin LLC.

10) Haynes checked Rio Virgin and found that the registered agent was neither Johnson nor Coache. A subpoena of the Rio Virgin bank account showed the account was co-owned by Johnson and Lonetti. While registered agents are common practice, Haynes found the lack of that agent on the bank account suspicious.

11) Haynes discovered a deposit from Lonetti in the account for $1,327,500.00. Haynes found that these funds were used to purchase several homes and were transferred into other individual accounts belonging to Johnson or Coache.

12) Haynes discovered a $15,000 transfer to Johnson that later was confirmed to have been paid to the general manager of VVWD, who would have had to approve the three-way deal.

13) The Rio Virgin account was closed after the money was disbursed and the company was later dissolved. It appeared that the sole purpose of Rio Virgin was to receive the transfer from Lonetti.

14) Chio and another officer interviewed Lonetti. Lonetti said he received a letter from the SE regarding his 1990 application telling him to either withdraw the application as there was no water left in the river to allocate or respond as to why the application should be granted. Lonetti said he contacted Johnson and he did so because Johnson was the Chief Hydrologist at VVWD and Lonetti had worked with him in the past. Lonetti stated that Johnson and him entered into a financial agreement with a confidentiality clause that Lonetti would not discuss.

15) Lonetti also said that Johnson assisted him in drafting a written response and that, while he did not know what Johnson did afterwards, the permit was approved. Lonetti said this was the only time he hired Johnson.

16) Lonetti said he did not know of Coache but had heard of him from Johnson. Lonetti said he did not know the extent of Coache and Johnson's friendship.

17) Lonetti stated that he knew Johnson had contacts in the SEO.

18) Lonetti said he wrote a $1.3 million deposit to Rio Virgin for Johnson's consulting fee.

19) Lonetti voluntarily taped the above facts.

20) Chio then served a subpoena on Lonetti for documents regarding the agreement between him and Johnson or regarding the transaction. The next day Lonetti provided him with the documents and the written agreement he had with Rio Virgin LLC. The agreement dealt with the same water rights that were involved in the three-way deal and included an agreement to confidentiality. The agreement included a clause that it would terminate on the "future sale of Virgin River" water not on the issuance of the permit.

21) At that time of the agreement, Rio Virgin was solely owned by Johnson. Johnson later traded Lonetti a 50% stake in Rio Virgin or Johnson's 60% ownership stake in a property. The stake in the property was evaluated at roughly $600,000. Johnson disclosed this income in his tax statements.

22) Chio obtained a copy of the public record of the water right that Johnson helped Lonetti acquire but found no indication explaining the reversal regarding the lack of water in the Virgin River. There was no mention of Coache in the file.

23) The record had other suspicious traits. Namely, the permit was listed as "owned" by Lonetti before approval by the SE and on a date near the agreement with Rio Virgin. Lonetti claimed to need the water to irrigate land but sold it within a year of approval.

24) Lonetti's permit was the only one approved for a private landowner for Virgin River water between 2004 and 2011.

25) Chio and a detective traveled to the main SEO for interviews. The SE at the time spoke with them and confirmed Coache was the area expert for the SEO but he had no knowledge of Coache being involved. The SE has the sole statutory authority to issue permits and relies on a committee to make recommendations. The SE must issue or deny permits according to statutorily defined requirements.

26) They also spoke to a Deputy Engineer who stated they did not remember talking to Coache about the permit. He stated that a field evaluation was likely performed by the local office, which Coache headed. If the evaluation report was delivered by phone or email there may not have been a record, but there was not evaluation on file.

27) Following a subpoena of Coache's SEO personal file, a record of a disciplinary action in 1989 regarding Coache engaging as a consultant on water right that fall within the SE's jurisdiction. In a 1989 memorandum, Coache was ordered to acquire the SE's approval before engaging in outside work related to Nevada water resources. In 2005, Coache was counseled again regarding outside business and possible conflicts. His business at the time, consulting golf courses regarding irrigation, was found to be permissible.

Probable cause depends on the crime the officer believes has taken place. Saucier v. Katz, 533 U.S. 194, 201 (2001). Here, the criminal investigation centered on a suspected bribery scheme around the Lonetti water deal and the laundering of those proceeds. Based on the above, the Court finds that a neutral magistrate could conclude that there was probable cause to suspect Coache was criminally involved in the issuance of the water rights. See Armstrong v. Asselin, 734 F.3d 984, 990 (9th Cir. 2013) ("[A]ll that is needed for a search or arrest warrant is probable cause, not proof[.]") (citing Illinois v. Gates, 462 U.S. 213, 271-72 (1983)).

A neutral magistrate could rely on circumstantial evidence to link Lonetti's payment to Rio Virgin to Coache, including the proximity of the real estate transaction to the alleged bribery scheme and the nearly precise evaluation of the property sold at half of the payment made by Lonetti. See Desert Palace, Inc. v. Costa, 539 U.S. 90, 100 (2003) ("The adequacy of circumstantial evidence also extends beyond civil cases; we have never questioned the sufficiency of circumstantial evidence in support of a criminal conviction, even though proof beyond a reasonable doubt is required."); cf. United States v. Currency, 283 F.3d 977, 980 (9th Cir. 2002)

("The determination of probable cause is based on the aggregate of facts, including circumstantial facts.") (forfeiture case). A neutral magistrate could have reasoned that Coache was incentivized to participate in the deal to facilitate the real estate transactions—exchanging his ownership stake for cash consideration, or, otherwise, that he would benefit from the deal in a way besides the proceeds from the property. A neutral magistrate could have reasoned that Coache, or somebody under his direction, issued a field evaluation on behalf of the Lonetti application and that could have worked to influence the SE in exercise his statutorily guided duties. A neutral magistrate could have reasoned that those spoken to at the SEO did not know Coache was involved because he hid his involvement from others at the SEO to avoid sanctions.

In short, probable cause existed even when the complained of aspects of the declaration supporting the warrant are cured. Smith, 640 F.3d at 937; see also Ewing, 588 F.3d 1218, 1224 (explaining that an officer's erroneous assumptions about evidence received are insufficient to invalidate a finding of probable cause).

Because probable cause existed once the warrant was cured of alleged defects, there is no need for the Court to consider whether Coache has adequately pleaded that misrepresentations or omissions were made intentionally or with reckless disregard for the truth. Count II fails as a matter of law. Smith, 640 F.3d at 938.

              iv.  Count III: Conspiracy to Violate Coache's Constitutional Rights

In Count III, Coache argues that Defendants engaged in a conspiracy to violate his constitutional rights. "To establish liability for a conspiracy in a § 1983 case, a plaintiff must demonstrate the existence of an agreement or meeting of the minds to violate constitutional rights." Crowe v. County of San Diego, 608 F.3d 406, 440 (9th Cir. 2010). A "common objective" to merely prosecute Coache is insufficient; fair prosecution would not violate his constitutional rights. Id. at 440-41. Such an agreement "may be inferred from conduct and need not be proved by evidence of an express agreement." Ward v. EEOC, 719 F.2d 311, 314 (9th Cir. 1983). An agreement "may be inferred on the basis of circumstantial evidence such as the actions of the defendants," meaning, for example, a showing that the alleged conspirators have committed acts that are unlikely to have been undertaken without an agreement. Mendocino Env't Ctr. v.

1   Mendocino County, 192 F.3d 1283, 1301 (9th Cir. 1999). However, a plaintiff must allege not

2   only the conspiracy, but also an actual deprivation of a constitutional rights. Hart v. Parks, 450

3   F.3d 1059, 1071-72 (9th Cir. 2006); see also id. at 1071 (holding that a § 1983 plaintiff must show

4   some "actual deprivation of [their] constitutional rights resulted from the alleged conspiracy.")

5   (quoting Woodrum v. Woodward County. Okl., 866 F.2d 1121, 1126 (9th Cir. 1989)).

6       Here, Count III is based on the same constitutional rights allegedly violated in Counts I

7   and II. For the reasons stated above, Coache has failed to plead a violation of his constitutional

8   rights in either count. With no allegation of deprivation of Coache's constitutional rights, Count

9   III also fails as a matter of law.

10      **B.  Coache's State Claims**

11      The Court now turns to Coache's Nevada law claims. The Court first addresses absolute

12  immunity as it applies to the state claims before turning to each state law claim. Because the Court

13  finds that Coache has insufficiently pleaded each of the claims, the Court need not consider

14  Defendants' other state law immunity arguments.

15          i.   Absolute Immunity

16      The Nevada Supreme Court has adopted prosecutorial immunity as expressed by the U.S.

17  Supreme Court in Imbler. Washoe Cnty. ex rel. Off. of Dist. Atty., Nonsupport Div. v. Second

18  Jud. Dist. Ct. of State of Nev. In & For Washoe Cnty., 98 Nev. 456, 457 (1982). As such, the Court

19  similarly applies the above absolute immunity analysis to Coache's state claims.

20          ii.  Count IV: Malicious Prosecution

21      Coache's first state claim argues Defendants maliciously prosecuted him. The elements of

22  malicious prosecution under Nevada law are: "(1) want of probable cause to initiate the prior

23  criminal proceeding; (2) malice; (3) favorable termination of the prior criminal proceedings; and

24  (4) damages." LaMantia v. Redisi, 118 Nev. 27, 30 (2002); Lester v. Buchanen, 112 Nev. 1426,

25  1428-29 (1996); Dutt v. Kremp, 111 Nev. 567, 571-72 (1995).

26      The magistrate judge's determination that there was probable cause to arrest Coache is not

27  irrebuttable evidence of probable cause. See Jordan v. State ex rel. DMV & Pub. Safety, 121 Nev.

28  44, 70 (2005), abrogated on other grounds by Buzz Stew, LLC v. City of N. Las Vegas, 124 Nev.

224, 228 n.6 (2008); <u>Ricord v. C.P.R.R. Co.</u>, 15 Nev. 167, 180 (1880) (recognizing that, in a malicious prosecution case, the commitment and indictment of a defendant constitutes prima facie evidence that probable cause for criminal prosecution existed but noting that the prima facie evidence could be rebutted with a relevant showing of false testimony or suppressed facts). However, as discussed above, Coache has not pleaded sufficient facts to undermine the magistrate's determination of probable cause. Therefore, the Court finds that Count IV fails as a matter of law.

> iii.  <u>Count V: Abuse of Process</u>

Coache next claims Defendants engaged in an abuse of process. The elements of a Nevada abuse of process claim are: "(1) an ulterior purpose by the defendants other than resolving a legal dispute, and (2) a willful act in the use of the legal process not proper in the regular conduct of the proceeding." <u>LaMantia</u>, 118 Nev. at 30; <u>Posadas v. City of Reno</u>, 109 Nev. 448, 457 (1993); <u>Kovacs v. Acosta</u>, 106 Nev. 57, 59 (1990). An ulterior purpose is any improper motive underlying the issuance of legal process. <u>See</u> <u>Posadas</u>, 109 Nev. at 457; <u>Laxalt v. McClatchy</u>, 622 F. Supp. 737, 751 (1985). Malice, want of probable cause, and termination in favor of the person initiating or instituting proceedings are not necessary elements for a prima facie abuse of process claim. <u>LaMantia</u>, 118 Nev. at 30 (citing <u>Nev. Credit Rating Bur. v. Williams</u>, 88 Nev. 601, 606 (1972).

Here, Coache provides nothing beyond conclusory allegations that Defendants had an ulterior purpose. Throughout the pleadings Coache conclusory asserts that Defendants were "biased" or conducted a "sham" investigation. However, the closest explanation provided is when Coache pleads "Defendant DiGiacomo was well out of his lane as a prosecutor. The question is why? [sic.] What motivated him? Money? Ego? Professional advancement? Personal involvement with somebody involved?" First, Coache does not address any ulterior motive held by Defendants Chio and Haynes. That is dispositive as to them. Second, rhetorical questions alone are not pleadings. <u>See</u> <u>Faulkner</u>, 706 F.3d at 1019 (requiring "allegations of material <u>fact</u>" to support claims on a motion to dismiss) (emphasis added). Coache asks the Court to speculate as to Defendants motives; the Court declines to do so. In sum, Count V fails as a matter of law. <u>See</u> <u>LaMantia</u>, 118 Nev. at 31 (holding that, on summary judgement, a plaintiff must present specific

facts of an ulterior purpose in the underlying lawsuit).

        iv.  <u>Count VI: Intentional Infliction of Emotional Distress</u>

Coache's Count VI claims that Defendants intentionally inflicted emotional distress on Coache. To state a claim for intentional infliction of emotional distress the plaintiff must establish: "(1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress, (2) the plaintiff's having suffered severe or extreme emotional distress, and (3) actual or proximate causation." <u>Dillard Dep't Stores, Inc. v. Beckwith</u>, 115 Nev. 372, 378 (1999). However, under Nevada law, where there was probable cause for the underlying conduct, an intentional infliction of emotional distress claim fails. <u>Palmieri v. Clark County</u>, 131 Nev. 1028 (Nev. Ct. App. 2015); <u>see also</u> <u>Nelson v. City of Las Vegas</u>, 99 Nev. 548, 665 (1983) ("[A]n arrest made with probable cause is privileged and not actionable.").

As discussed above, the Court finds that there was probable cause sufficient to justify Coache's arrest and prosecution. Therefore, Count VI fails as a matter of law.

**V.    CONCLUSION**

**IT IS THEREFORE ORDERED** that Defendant DiGiacomo's Motion to Dismiss (ECF No. 61) is **GRANTED** with prejudice.

**IT IS FURTHER ORDERED** that Defendants Chio and Haynes' Motion to Dismiss (ECF No. 62) is **GRANTED** with prejudice.

The Clerk of the Court is respectfully instructed to close this case.

DATED September 30, 2023



                                        _____
                                        **RICHARD F. BOULWARE, II**
                                        **UNITED STATES DISTRICT JUDGE**